# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION

| | |
|---|---|
| SHIRLEY SUSANNE RHODABARGER, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, ) <br> Acting Commissioner of the ) <br> Social Security Administration,) <br> ) <br> Defendant. ) <br> _____ ) | Case No. EDCV 14-2020-AS <br><br> **MEMORANDUM OPINION** |

## PROCEEDINGS

On October 2, 2014, Plaintiff filed a Complaint seeking review of the denial of her applications for Disability Insurance Benefits and Supplemental Security Income. (Docket Entry No. 3). The parties have consented to proceed before the undersigned United States Magistrate Judge. (Docket Entry Nos. 8-9). On February 2, 2015, Defendant filed an Answer along with the Administrative Record ("AR"). (Docket Entry Nos. 12-13). The parties filed a Joint Position Statement ("Joint

Stip.") on April 24, 2015, setting forth their respective positions regarding Plaintiff's claims. (Docket Entry No. 15).

The Court has taken this matter under submission without oral argument. See C.D. Cal. L.R. 7-15; "Order Re: Procedures In Social Security Case," filed October 6, 2014 (Docket Entry No. 6).

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

On June 27, 2011, Plaintiff, formerly employed as an in-home caregiver (see AR 53, 147-48), filed applications for Disability Insurance Benefits and Social Security Income, alleging a disability since February 15, 2010. (See AR 132-35). On January 2, 2013, the Administrative Law Judge, Marti Kirby ("ALJ"), heard testimony from Plaintiff, who was not represented by counsel, and vocational expert Sandra Fioretti. (See AR 45-69). On February 11, 2013, the ALJ issued a decision denying Plaintiff's applications. (See AR 13-22). After determining that Plaintiff had severe impairments -- "history of fibromyalgia; osteoarthritis of the knee; lumbago; a bipolar disorder; and a history of attention deficit hyperactivity disorder" (AR 15-16)--, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[1] to perform light work[2] with the following limitations: a sit/stand option at one hour intervals with brief position changes; occasionally bending, stooping, climbing stairs and balancing; rarely

---

[1] A Residual Functional Capacity is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

[2] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b).

kneeling, crawling, squatting or crouching; no climbing ladders, ropes or scaffolds; no working at unprotected heights; no working around moving machinery or other hazards; no performing jobs requiring hypervigilance or intense concentration on a particular task; and no working with extreme temperatures and vibration. (AR 17-20). The ALJ also found that Plaintiff would "likely be off task 10 percent of the workday/workweek due (sic) chronic pain or side effects of medications for about 48 minutes a day or 4 hours a week." (AR 17). After finding that Plaintiff was not able to perform her past relevant work as a home attendant (AR 20), the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform, and therefore that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 21-22).

Plaintiff requested that the Appeals Council review the ALJ's decision. (AR 8). The request was denied on August 26, 2014. (AR 1-3). The ALJ's decision then became the final decision of the Commissioner, allowing this Court to review the decision. See 42 U.S.C. §§ 405(g), 1383(c).

**PLAINTIFF'S CONTENTIONS**

Plaintiff alleges that the ALJ erred in failing to properly: (1) develop the record; and (2) consider Plaintiff's testimony and make proper credibility findings. (See Joint Stip. at 3-7, 10-17, 25).

**DISCUSSION**

**A. The ALJ Did Not Fail to Develop the Record**

Plaintiff asserts that the ALJ failed to develop the record by "supplement[ing] the record with a consultative examination" concerning Plaintiff's mental impairments. (See Joint Stip. at 3-7, 10). Defendant asserts that the ALJ had no duty to further develop the record. (See Joint Stip. at 7-10).

An ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (citation omitted); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) ("In making a determination of disability, the ALJ must develop the record and interpret the medical evidence."); Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978) ("[W]here the claimant is not represented, it is incumbent upon the ALJ 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'"). Nonetheless, it remains Plaintiff's burden to produce evidence in support of her disability claim. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (as amended). Moreover, the ALJ's duty to develop the record is triggered only when there is "ambiguous evidence" or when "the record is inadequate to allow for proper evaluation of the evidence[.]" Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). An ALJ has broad discretion in determining whether to order a consultative examination and may do so when "ambiguity or insufficiency in the evidence . . . must be resolved."

Reed v. Massanari, 270 F.3d 838, 842 (9th Cir. 2001) (citation omitted); see also 20 C.F.R. §§ 404.1519a(b)(1), 416.919a(b) ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on your claim.").

Plaintiff's contention that the ALJ should have sent her for a complete psychological consultative examination is based on the fact that she was diagnosed with a bipolar disorder, depression, a panic disorder and ADHD, assessed with Global Assessment of Functioning ("GAF") scores of 45, 50 and 65,[3] and prescribed medications (i.e., Zoloft, Elavil). (See Joint Stip. at 3-6, citing AR 225-32 [2011 treatment records from Dogon Behavioral Medical Group in Riverside, California], and AR 264-70 [2012 treatment records from Charlie Family Care in Riverside, California]).

The ALJ fully considered the records of Plaintiff's mental health treatment at Dogon Behavioral Medical Group ("Dogon"). (See AR 18).

---

[3] A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR"), 34 (2000).

A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." (Id.).

A GAF score of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful relationships." (Id. at fn. 6).

5

The ALJ noted that from April 2011 to August 2011, Plaintiff received individual psychotherapy and medication management, and complained of symptoms including mood swings, irritability, insomnia, depression, panic attacks, poor concentration, lack of interest in activities and isolation. (See AR 225, 227, 229-32). On April 28, 2011 and May 23, 2011, Plaintiff was diagnosed with a bipolar disorder, a panic disorder and depression, and was prescribed Zoloft and Elavil. (See AR 226-28). The ALJ also found that "[w]ithin a few months of treatment, [Plaintiff] was reporting symptom improvement." (See AR 18, citing AR 230-32 [June 8, 2011 note: Plaintiff reported that "she still has been taking the medication as prescribed"; "she has still had less difficulty with the target symptoms"; "she has still continued to have less ongoing difficulty with mood swings, anxiety, and depression"; "[t]he episodes are now occurring on a less frequent basis"; "she has been feeling a little less depressed and anxious and having less frequent and severe panic attacks"; and "she is still experiencing less difficulty with anxiety, and has had no difficulty with panic attacks"]; AR 231 [July 6, 2011 note: Plaintiff reported that "she still has been taking the medication as prescribed"; she has continued to have less difficulty with the target symptoms"; "she has still been having less ongoing difficulty with the mood swings, anxiety, and depression"; "[t]he episodes are not now occurring on a very frequent basis"; "she has been feeling a little less depressed and anxious and having less frequent and severe panic attacks"; and "she is still experiencing less difficulty with anxiety, and has had no difficulty with panic attacks"]; and AR 232 [August 11, 2011 note: Plaintiff reported that "she has still been taking the medication as prescribed"; "she has continued to have less difficulty with the target symptoms"; medications were working well with

no side effects; "she has still been having less ongoing difficulty with mood swings, anxiety, and depression"; "[t]he episodes are not now occurring on a very frequent basis"; "she has been feeling a little less depressed and anxious and having less frequent and severe panic attacks"; and "she is still experiencing less difficulty with anxiety, and has had no difficulty with panic attacks"]).

The ALJ fully considered the records of mental health treatment at the Riverside County Department of Mental Health, (see AR 18-19), noting that, an initial mental health assessment on April 30, 2012 revealed that Plaintiff had a depressed mood, impaired short term memory, poor insight and poor judgment; Plaintiff was diagnosed with a bipolar disorder and an attention deficit hyperactivity disorder by history; and individual therapy and family therapy were recommended. Plaintiff did not have any suicidal ideation, suicidal intent, homicidal ideation, or homicidal intent, and Plaintiff was taking Zoloft and Elavil. (See AR 264-66). The ALJ also found that "subsequent treatment notes reflected symptom improvement, and in November 2012, the assessment was that the medications were effective and [Plaintiff] was stable." (See AR 18-19). The ALJ's statement about Plaintiff's symptom improvement, medication effectiveness, and Plaintiff's stability was supported by notations in the progress notes (see AR 270 [May 5, 2012 note stating that Plaintiff was "stable on meds"]; AR 269 [June 2, 2012 note stating that Plaintiff was doing better (depression was 5 out of 10) and that the medications were effective; Id. [July 7, 2012 note stating that Plaintiff was less depressed (depression was 3 out of 10) and medications were effective; Id. [August 11, 2012 note stating that Plaintiff's depression was better and medications were effective; AR 268 [September 5, 2012 note stating

that the medications were effective]; Id. [October 13, 2012 note stating that the medications were effective]; Id. [November 10, 2012 note stating that Plaintiff was doing "good on meds," "offers no complaint[s]" and was "stable," and that the medications were effective]; and AR 267 [December 8, 2012 note stating that Plaintiff was "stable on meds" and that the medications were effective].

The ALJ also fully considered Plaintiff's GAF scores of 50 on April 28, 2011 (AR 226), 45 on April 30, 2012 (AR 264), and 65 on May 5, 212 (AR 270). (See AR 19).

The ALJ properly gave little weight to Plaintiff's GAF scores because the "subjectively assessed scores reveal only snapshots of impaired and improved behavior." (AR 19). See Garner v. Colvin, 2015 WL 5603975, *2 (9th Cir.) (The ALJ properly discounted a therapist's singular GAF score because it "provided only a snapshot impression and not a long-term prediction of RFC"); Margulis v. Colvin, 2015 WL 1021117, *16 (E.D. Mar. 6, 2015) ("GAF scores are unreliable indicators of a claimant's ability to perform sustained work, as they are 'merely a snapshot in time' that may or may not be supported by the overall medical record.") (citation omitted); Deck v. Colvin, 2014 WL 7388792 (9th Cir.) ("[T]he [GAF] score is used for treatment purposes and not for rating a person's ability to work.").

Moreover, the ALJ properly relied on the "objective details of the record which more accurately describe [Plaintiff's mental] impairment and limitations" to reasonably determine that there was "symptomatic improvement with treatment as would allow [Plaintiff] to function at a

sufficient level to perform the mental demands of work." (AR 19). As the ALJ found, the limited records from Plaintiff's mental health care providers, as discussed above, indicated that Plaintiff's mental health improved as a result of her treatment, including medication. See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1008 (9th Cir. 2006)("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for [disability] benefits.").

Thus, the ALJ did not fail to develop the record further by not ordering a psychological evaluation, since the evidence cited by Plaintiff was not ambiguous, and the record was adequate to properly evaluate Plaintiff's mental impairments and limitations. See Meltzer v. Colvin, No. 13-6164, 2014 WL 2197781, *4 (C.D. Cal. May 27, 2014) (ALJ did not fail to develop record by not ordering a psychiatric consultative examination because the record was neither ambiguous nor inadequate to permit a proper evaluation of the claimant's mental impairment and the evidence showed that claimant's schizophrenia was stable and well controlled with medication); Walsh v. Astrue, No. 11-170, 2012 WL 425331, *4 n.5 (C.D. Cal. Feb. 10, 2012) (ALJ did not fail duty to develop record by not ordering psychiatric consultative examination or medical expert testimony because the record was neither ambiguous nor inadequate and the ALJ thoroughly discussed the "plethora" of mental health records).

///
///
///

**B.   The ALJ Properly Assessed Plaintiff's Credibility**

Plaintiff asserts that the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's credibility. (See Joint Stip. at 10-17, 25). Defendant asserts that the ALJ provided proper reasons for finding Plaintiff not fully credible. (See Joint Stip. at 18-25).

The ALJ summarized Plaintiff's testimony as follows:

> [Plaintiff] alleged she was disabled and unable to work due to being bipolar and having fibromyalgia and bursitis (Ex. 2E). At the hearing, [Plaintiff] conveyed that she had pain in various parts of her body, including to her knees and below her hips, neck and shoulders. Her pain was at a level of about 8 on a pain scale of 1 to 10, although her medications did help somewhat with her pain. In addition to her musculoskeletal complaints, [Plaintiff] testified that she is under mental health treatment. In terms of her functioning, [Plaintiff] conveyed that she could stand for 1 hour, walk for 30 to 60 minutes, and that she could sit for a few hours.

(AR 18); see also AR 145-52 [Disability Report - Adult], 45, 47-58 [Hearing Testimony].

After summarizing Plaintiff's testimony, the ALJ made the following assessment of Plaintiff's credibility:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

The objective findings, the treatment notes, and the record on the whole supports the residual functional capacity for the range of light work as assessed herein. The medical evidence includes the report of a consultative orthopedic examination completed on September 20, 2011 with Dr. Terrance Flanagan (Ex 2F). The claimant complained of multi-joint arthralgias and diffuse muscular pain, and worsened with any type of activity, including sitting, standing, walking, bending and lifting. The examination found multiple painful points throughout the upper and lower torso, consistent with fibromyalgia. In addition, the examination revealed mal-tracking in both patallae consistent with patellofemoral syndrome. Nonetheless, Dr. Flanagan concluded the claimant was without any functional limitations.

The evidence contains treatment notes under date of January 4, 2012 from Dr. Babak Zamiri reflecting the diagnoses of fibroymalgia, knee osteoarthritis and depression (Ex 3F pg 1). In terms of treatment, Dr. Zamiri recommended regular exercise and physical therapy for the fibroymalgia. The later

> records reflect that physical therapy commenced on June 12, 2012 upon a diagnosis of lumbago (Ex 4F pg 4). By August 29, 2012, the claimant was reporting that her low back pain had significantly reduced since starting therapy, and that she also had noticed a difference especially when walking her dog (Ex 4F pg 19).

(AR 18).

After discussing Plaintiff's mental health records, including the GAF scores, as well as the weight given to them (as discussed above), and the opinions of the consultative orthopedic examiner and the state agency medical consultants, as well as the weight given to them (see AR 18-19), the ALJ wrote:

> In formulating the claimant's residual functional capacity, the claimant's subjective allegations as to her impairments and functional restrictions have been considered, but do not persuasively establish a more restrictive functional capacity than as assessed herein. At the hearing, the claimant conveyed that her cessation of employment was on account of quitting her job as an in-home care provider, following which she entered school to become a nurse, but did not complete the program.[4] Despite the diagnosed physical and mental disorders, the record shows the claimant has received conservative care, to include medications, physical

---

[4] [See AR 53-54].

therapy, and individual and family therapy, and to which the claimant has reported a positive response to same. The claimant's statements of record indicate that despite her medical problems, she is able to engage in activities typical of most individuals, to include taking her children to school, assisting with homework, making dinner, watching television, doing house chores with help from her family, shopping for groceries, attending appointments, using a computer, and reading (Ex 3E).

(AR 19, bracketed footnote added).[5]

---

[5] Notwithstanding the ALJ's finding that Plaintiff was not fully credible, the ALJ reasonably accounted for Plaintiff's subjective complaints in the determination about Plaintiff's RFC:

After consideration of the record in its entirety, the Administrative Law Judge thus finds [Plaintiff] is capable of performing the demands of work with the residual functioning capacity set forth above. [Plaintiff's] musculoskeletal disorders in general are addressed by limiting [her] to light work. This gives generous consideration to her complaints, and in light of her treatment history and the medical examination findings which show that despite the disorders, [Plaintiff] maintains good mobility in the joints throughout the upper and lower extremities and normal neurological functioning in terms of motor strength, reflexes and sensation (Ex 2F pg 5 & 5), a more restrictive functional capacity is not warranted. [Plaintiff's] testimony indicating that prolonged sitting, standing or walking are problematic is acknowledged by the inclusion in the [RFC] which allows for a sit/stand option at one hour intervals. This is fully consistent with her testimony that she felt capable of standing for one hour, walking for up to one hour, and sitting for a few hours at a time. Based on the knee disorder, the preclusion against climbing ladders/ropes/scaffolds and restricting activities requiring kneeling, crawling, squatting and crouching to a rare basis are also included. As exposure to temperature extremes and vibration could be expected to aggravate her pain, these restrictions are for prophylactic reasons. The mental status examinations, treatment and response, and [Plaintiff's] own

(continued...)

A claimant initially must produce objective medical evidence establishing a medical impairment reasonably likely to be the cause of the subjective symptoms. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991). Once a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his pain and symptoms only by articulating clear and convincing reasons for doing so. Smolen v. Chater, supra; see also Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).

Here, substantial evidence supports the ALJ's finding that Plaintiff's testimony about the intensity, persistence and limiting effects of the symptoms was not fully credible.

---

[5] (...continued)
description of her activities indicate that she is able to maintain concentration, persistence and attention as would allow the completion of the regular workday with acceptable pace and attendance. Hence, the mental disorders are addressed by limiting, but not totally precluding, functioning in the workplace as represented by the [RFC] which restricts [Plaintiff] from jobs requiring hypervigilance or intense concentration and for the allowance of being off task for 10 percent of the time to accommodate pain or medication side effects.

(AR 20).

To the extent that the ALJ did not find Plaintiff fully credible because of her testimony that she quit her job as an in-home care provider, that reason would not be clear and convincing. Plaintiff testified she quit her in-home care provider job because of her disability, namely, she was not able to lift the weight (225 pounds) (see AR 53-54). Compare Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir. 2001) (holding that the ALJ did not err in finding that the claimant's testimony was not credible based, in part, on the claimant's testimony and statements to a doctor "that he left his job because he was laid off, rather than because he was injured").

The ALJ's partial discounting of Plaintiff's testimony based on her ability to perform certain daily activities, such as "taking her children to school, assisting with homework, making dinner, watching television, doing house chores with help from her family, shopping for groceries, attending appointments, using a computer, and reading" (see AR 161-64) also was not a clear and convincing reason. See Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) ("[T]he mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled."); Reddick v. Chater, supra ("Only if the level of activity were inconsistent with the Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").

However, the ALJ properly found that Plaintiff's testimony was not fully credible based on the fact that Plaintiff received conservative treatment, including medications, physical therapy, and individual and family therapy, and based on the fact that Plaintiff responded positive to such care. See Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (a favorable response "to conservative treatment undermines [the claimant's] reports regarding the disabling nature of his pain"); Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment[.]"); Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly rejected subjective pain complaints where the claimant's "claim that she experienced pain approaching the highest level imaginable was inconsistent with the 'minimal, conservative treatment' that she received"); Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995) (ALJ may properly rely on the fact that only conservative treatment has been prescribed). As the ALJ noted, within months of obtaining mental health treatment, Plaintiff's mental health improved and Plaintiff became stable with the help of medication. (See AR 225-32, 264-70). Moreover, as the ALJ noted, the records reflect that Plaintiff obtained treatment at Arthritis Medical Clinic in Corona, California on three occasions (May 17, 2010, January 11, 2011, and January 4, 2012), was diagnosed, inter alia, with fibromyalgia and knee osteoarthritis, and was recommended regular exercise, physical therapy and/or medication (see AR 240-42), received physical therapy at Marketplace Physical Therapy from June 12, 2012 to August 29, 2012 (see AR 245-63), and reported symptomatic

improvement since she started physical therapy (see AR 263 [August 29, 2012, stating: "Patient reports that her low back pain has significantly reduced since starting therapy. She states that she notices a difference especially when walking the dog."]).

Moreover, the ALJ properly partially discredited Plaintiff's testimony about her limitations because it was not supported by the objective medical evidence (see AR 18-19). See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects); Morgan v. Commissioner, 169 F.3d 595, 599-60 (9th Cir. 1999).

At the September 20, 2011 consultative orthopedic examination, Dr. Terrance Flanagan of Diamond Medical Group found that Plaintiff was well developed, well nourished, and in no acute distress; sat and stood with a normal posture; had a normal gait; had tenderness to palpation of the cervical paraspinal muscles, but that the neck had a normal curvature, no deformity or asymmetry, no swelling, palpable mass or inflammation, no evidence of muscle atrophy or spasm, and a full range of motion; had tenderness to palpation of the lumbar paraspinal muscles and pain with axial rotation of the

trunk, but that the back had normal contour without evidence of scoliosis, no paraspinal muscle spasm, and no pain with axial loading of the spine at the head; had normal range of motion, no swelling, palpable mass or inflamation, and no muscle atrophy or spasm of the shoulder, elbows, wrists and hands (although the elbows and hand had pain upon palpation); had normal range of motion, no deformity, no swelling, palpation mass or inflamation, and no muscle atrophy or spasm of the hips, knees and ankles(although there was mal-tracking of the patellae upon extension, and there was tenderness to palpation of the bilateral medial joint lines and the bilateral plantar fascia); had a normal neurological examination; had normal sensation of the upper and lower extremities; and had normal reflexes. Although Dr. Flanagan found multiple painful points throughout Plaintiff's body consistent with fibromyalgia and diagnosed Plaintiff with fibromyalgia and bilateral patellofemoral syndrome, Dr. Flanagan found that Plaintiff had no specific functional limitations. (See AR 233-37).

At Plaintiff's initial psychotherapy evaluation visit on April 28, 2011, Plaintiff's speech was appropriate; her stream of thought was spontaneous; her associations were normal; her judgment and insight were fair; she was oriented to person, place and time; her memory was intact; her span and concentration were fair; and her mood and affect were normal and appropriate to situation. (See AR 225).

A May 23, 2011 mental status examination revealed that Plaintiff was well developed, well nourished, and in no acute distress; she was mildly anxious and not agitated; she was able to establish good eye contact; her speech was clear, audible, understandable and not pressured; her thoughts were relevant and coherent, and were verbalized in a free-flowing manner; there was no evidence of a florid thought disorder; and Plaintiff denied auditory or visual hallucinations. (See AR 227).

On September 27, 2011 and March 14, 2012, state agency reviewing physicians found that Plaintiff did not have any severe physical and mental impairments or any physical or mental restrictions. (See AR 77-83, 86-93).

While, as discussed above, an April 30, 2012 mental status examination revealed that Plaintiff had a depressed mood, her short-term memory was impaired, and that she had poor judgment and insight, her attention, psychomotor, speech and thought were within normal limits, she was oriented to time and place, her affect was appropriate, and she had no suicidal or homicidal ideation. (See AR 264-65).

Since the ALJ properly partially discredited Plaintiff's testimony about her limitations based on the conservative nature of her treatment and her positive response to such treatment, as well as based on the lack of objective evidence supporting Plaintiff's testimony about her limitations, any error in finding that Plaintiff's testimony was not fully credible based on her work

19

history and daily activities was harmless. See <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1162-63 (9th Cir. 2008)(finding that the ALJ's error in giving two invalid reasons for partially discrediting Plaintiff's testimony was harmless where the ALJ gave valid reasons for partially discrediting Plaintiff's testimony); <u>see also</u> <u>Tommasetti v. Astrue</u>, <u>supra</u>, 533 F.3d at 1038 (an ALJ's error is harmless "when it is clear from the record . . . that it was 'inconsequential to the ultimate nondisability determination.'"); <u>Burch v. Barnhart</u>, <u>supra</u>, 400 F.3d at 679 ("A decision of the ALJ will not be reversed for errors that are harmless.").

**ORDER**

For the foregoing reasons, the decision of the Commissioner is affirmed.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: January 19, 2016.

/s/
ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE